UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CARS NORTHWEST, INC., a corporation doing business as Cars-R-Us, and MICHAEL MAES, | Case No. 3:17-cv-01950-AC |
| Plaintiffs, | OPINION AND ORDER |
| v. | |
| CITY OF GLADSTONE, a municipal entity, ERIC SWANSON, an individual, LINDA NEACE, an individual, PATRICK McMAHON, an individual, NEIL REISNER, an individual, STEVE JOHNSON, an individual, THOMAS MERSEREAU, an individual, KEVIN JOHNSON, an individual, JACQUE BETZ, an individual, and TAMMY STEMPEL, an individual, | |
| Defendants. | |

_____

ACOSTA, Magistrate Judge:

Plaintiffs Cars Northwest, Inc. ("Cars" or "Cars-R-Us"), and Michael Maes ("Maes")

(collectively "Plaintiffs") bring this action pursuant to 42 U.S.C. § 1983 against Defendants the

City of Gladstone ("the City"), Eric Swanson, Linda Neach, Patrick McMahon, Neil Reisner, Steve Johnson, Thomas Mersereau, Kevin Johnson, Jacque Betz, and Tammy Stempel's (the "Individual Defendants") (collectively "Defendants"). Plaintiffs allege Defendants violated their Fourteenth Amendment due process rights by depriving them of relocation benefits under Oregon Revised Statute ("O.R.S.") § 35.510 and the Uniform Relocation Assistance and Real Property Acquisitions Policy Act ("URA"), 42 U.S.C. §§ 4601 et seq., when Defendants purchased property they were leasing in order to develop a new City Hall and Police Station. Presently before the court is Defendants' motion for summary judgment (ECF No. 24). For the following reasons, the court grants Defendants' motion.

*Factual Background*

Maes is the sole owner of Cars-R-Us, a wholesale and retail business selling used cars, boats, motorcycles, and other vehicles. (Decl. Michael Maes Supp. Pl.'s Resp. Mot. Summ. J. ("Maes Decl.") ¶¶ 2-5, ECF No. 33-1.) For over twenty years, Cars operated on a gravel parking lot at 18565 Portland Avenue, Gladstone, Oregon ("the Portland Avenue Property" or "the Property"). (*Id.* ¶ 4.) The Portland Avenue Property was owned by the Kmetic family, specifically Kenneth Kmetic and Steven and Kevin Kmetic as trustees of the Walter J. Kmetic Trust. (Decl. Bradley F. Piscadlo ("Piscadlo Decl.") Ex. 7, attaching Dep. Steven Kmetic ("Steven Kmetic Dep.") at 7:2-23, ECF No. 24-1 at 60.) Maes leased space on the Property from Kmetic RV Storage on a month-to-month basis for $463 per month. (Piscadlo Decl. Ex. 4, attaching Dep. Michael Maes ("Maes Dep.") at 38:20-24, 39:3-11, ECF No. 24-1 at 27-28; Maes Decl. ¶ 4, ECF No. 33-1 at 2.) Lynne Kmetic, spouse of Kenneth Kmetic, also rented space at the Portland Avenue Property for a hair salon. (Maes Decl. ¶ 8, ECF No. 33-1 at 3.) Multiple other businesses leased property

from the Kmetics at the Portland Avenue Property on a month-to-month basis. (Piscadlo Decl. Ex. 6, attaching Dep. of Lynne Kmetic ("Lynne Kmetic Dep.") at 6:5-15, ECF No. 24-1 at 48.)

In March 2016, the City approached the Kmetic family about possibly purchasing the Property. The City used real estate agent Tony Reser and the Kidder Matthews real estate firm to assist the City in negotiating the purchase. (Decl. Tony Reser ("Reser Decl.") ¶ 1, ECF No. 24-2.) The City had identified the Property for expansion of the City's Public Works Building and as a staging area while the new City Hall was being built. (Decl. Cameron Ramelli Supp. Pl.'s Resp. Mot. Summ. J. ("Ramelli Decl.") Ex. 5, ECF No. 33-2.) In a draft letter, Reser suggested that the City approach the Kmetic family to suggest a "friendly condemnation" in order to allow the Kmetic family to defer potential taxes on the sale. (Ramelli Decl. Ex. 5, ECF No. 33-2.) The City's attorney, David Doughman, and Reser arranged a meeting with the Kmetic family to discuss sale of the Property. The Kmetics were receptive to selling the Property, and in April 2016, negotiated a sale price of $910,000. (Piscadlo Decl. Ex. 9 at 4, ECF No. 24-1 at 78.) Pursuant to the agreement, the Kmetics were to deliver the Property free and clear of all tenants. (*Id.*) Additionally, an addendum to the Purchase and Sale agreement provided that the "[s]ubject purchase by the City of Gladstone is contemplated as an acquisition in lieu of condemnation (involuntary conversion)" pursuant to a Section 1033 Exchange. (*Id.* at 24, ECF No. 24-1 at 98.)

In early August 2016, shortly before closing, the City became aware that some of tenants on the Property believed they were entitled to relocation benefits and that the Kmetic family was willing to sell only because condemnation had been threatened. (Maes Decl. ¶ 11, ECF No. 33-1.) The City agreed to provide the tenants cash settlements in the amount of two months' rent and to provide additional lease time on the Property in exchange for signed agreements releasing the City

from any potential claims for relocation benefits. (Piscadlo Decl. Ex. 15, ECF No. 24-1 at 108; Maes Decl. ¶ 12, ECF No. 33-1.)

On September 20, 2016, the *Clackamas Review*, a local newspaper, published an article about the City's purchase of the Property. (Maes Decl. Ex. 1 at 1, ECF No. 33-1 at 7.) The article highlighted concerns expressed by some of the tenants and suggested that the Kmetic family had been forced to sell. (*Id.*) The article indicated that the City believed the site would be ideal for a new Police Station. (*Id.*) Tenant Bruce Hildreth, president of the Sherie Hildreth Ovarian Cancer Foundation ("SHOC"), operated the Teal Ribbon Boutique on the Property. Hildreth indicated in the article that he had received an eviction notice and had no plans of relocating. (*Id.*) The article also quoted Lynne Kmetic as indicating that the family did not want to sell the property, but "we didn't have a choice. [That is what happens] when you deal with government entities." (*Id.* at 2, ECF No. 33-1 at 8; Lynne Kmetic Dep. 6:5-15, ECF No. 24-1 at 48.)

The following day, the City sent an email to the reporter asking the *Clackamas Review* to run a response to the article that provided the following:

> The [C]ity has expressed in a public meeting it has no plans to force a sale of the Kmetic property or use its eminent domain authority to acquire the property. The [C]ity has always understood the property owner would terminate the month-to-month tenancies in advance of a sale of the property to any buyer, the [C]ity or otherwise. For these reasons, the [C]ity does not believe it is obligated to provide relocation assistance to the tenants. However, the fact is the [C]ity **has** offered money to the tenants in the form of two month's rent. Two of the tenants do not pay any monthly rent to the property owner, yet the [C]ity is offering those tenants money as well. We are awaiting confirmation from the property owner that the tenants have accepted the [C]ity's offer.

(Piscadlo Decl. Ex. 11, ECF No. 24-1 at 103 (emphasis in original).) The *Clackamas Review* did not run the City's response.

On October 5, 2016, Reser received a text message from Lynne Kmetic indicating that some of the tenants were unwilling to sign the releases "because their attorneys have told them the release is not legal and that they should get 60 days to move." (Piscadlo Decl. Ex. 12, ECF No. 24-1 at 104.) On October 7, 2016, Reser requested a meeting with Steve Kmetic prior to a Gladstone City Council meeting scheduled for October 11, 2016, to discuss the issue with the tenants. (*Id.* Ex. 13, ECF No. 24-1 at 105-06.) Additionally on October 7, 2016, the City's attorney Doughman, sent an email to Steve Kmetic providing that the City needed to better understand the issue with the tenants. (*Id.*) Doughman noted that he understood some tenants were unwilling to sign the releases, and that the City may be "amenable to allowing some or all of them more time to vacate the property." (*Id.*) However, Doughman provided that:

> in light of the newspaper article from a couple of weeks ago, and, candidly, the comment from Ms. Kmetic alluding to the [C]ity's purchase of the property as "forced", I cannot recommend the [C]ity close on the property unless it is clear that it will not face a legal action from the tenants after we close on the property.

(*Id.*)

On October 10, 2016, Reser met with Steve Kmetic, and reported to Doughman that the tenants were under the "mistaken impression" that the property was being condemned, and that Kmetic indicated that "now that they know it is an outright sale he doesn't think they will object." (*Id.* at Ex. 14, ECF No. 24-1 at 107.) Mr. Reser also indicated that Kmetic requested that new releases be drafted on "Gladstone letterhead" and explain that it is not a condemnation, but an arm's length sale. (*Id.*) The City revised the releases to include the following language: "The City is not using its eminent domain authority to acquire the Portland Avenue Property or otherwise forcing the sale of the Property." (Piscadlo Decl. Ex. 15 at 1, ECF No. 24-1 at 108.) On October 18, 2016, Maes, on behalf of Cars, signed the revised release which stated "[a]s the City and Trust

have explained to Cars, the City and the Trust are engaged in an arms-length, negotiated purchase and sale of the Property." (*Id.*) Specifically, Plaintiff agreed to the sum of $926 and the right to stay on the Property through January 1, 2017 in exchange for releasing the City "from any obligation it may have under state or federal law, including ORS 35.500 – 35.530, to provide relocation assistance to Cars if it purchases the property." (*Id.*)

At a November 9, 2016 City Council Meeting, the City passed Resolution 1093 which approved the purchase of the Property. (*Id.* at Ex. 16 at 3-4, ECF No. 24-1 at 111-12; *Id.* at Ex. 17, ECF No. 24-1 at 116.) At the November 9 Meeting, Councilor Steve Johnson noted that there had been a lot of misinformation about the Portland Avenue Property purchase, and asked Doughman to clarify some issues. (*Id.* at 3.) Doughman confirmed that the City was not using its eminent domain authority to purchase the Property. (*Id.*) Also at the November 9 Meeting, several tenants attempted to rescind their agreements to release the City, including Maes. (Exhibit 4 to Maes Decl., ECF No. 34 (audio file of November 9, 2016 Gladstone City Council meeting). Some tenants were frustrated and expressed that the compensation they received was not equitable compared to other tenants. (Piscadlo Decl. Ex. 16 at 4, ECF No. 112.) The City closed the sale on the Portland Avenue Property on December 21, 2016. (*Id.* at Ex. 18, ECF No. 24-1 at 117.)

On December 28, 2016, Maes sent a letter to Gladstone Mayor Tammy Stepel, Gladstone City Councilors, and Doughman requesting relocation benefits pursuant to O.R.S. § 35.500. (Maes Decl. ¶ 14, Ex. 2, ECF No. 33-1 at 12.) In the letter, Maes contended that the City failed to provide adequate notice to tenants of their eligibility for relocation benefits, assistance, and reimbursement of moving expenses. (*Id.*) Maes stated that if his request for benefits was denied, that he was requesting an appeal under O.R.S. § 35.520. (*Id.*) And, Maes attempted to rescind his release,

contending that he was coerced into signing it and that he was not given notice as required under the statute. (*Id.*).

On January 12, 2017, the City responded to Maes, denying his request for relocation benefits and refusing to conduct an "appeal." (Piscadlo Decl. Ex. 20, ECF No. 24-1 at 119.) According to the City, Maes was not entitled to benefits under the statute for several reasons, including: he is not a "displaced person" under the Oregon statute; the Kmetics terminated his lease; he agreed to move; he released the City from any potential relocation benefits; and the City did not utilize its eminent domain authority to acquire the Property. (*Id.*) On January 20, 2017, Maes's attorney David Griggs sent an email to Doughman contending that O.R.S. § 35.510 applies, that all the tenants were entitled to relocation benefits, the releases are unenforceable, and that the City should follow the process for determining the relocation benefit amounts. (*Id.* at Ex. 21, ECF No. 24-1 at 120.)

In response, Doughman set up a meeting with Griggs to explore whether a resolution could be reached. (*Id.* at Ex. 21, ECF No. 24-1 at 121.) In February 2017, the City sent Maes a letter indicating that although they disputed that he was entitled to relocation benefits, the City was agreeable to terms that would facilitate removal of his property from the Portland Avenue Property, including potentially providing him additional time and/or additional money beyond what it had already paid. (*Id.* at Ex. 24, ECF No. 24-1 at 123.)

On March 6, 2017, Maes and Griggs met with Doughman, and Mayor Tammy Stempel, City Councilor Patrick McMahon, City Councilor Kim Sieckmann, and City Administrator Eric Swanson. (*Id.* at Ex. 24, ECF No. 24-1 at 123-24; Maes Dep at 126:6-127:18, ECF No. 24-1 at 31.) At the March 6 meeting, the City reiterated its belief that the relocation statute did not apply

to Maes and rejected Maes's offer of $40,000, and Maes rejected the City's offer of $13,500. (Maes Dep. at 127:10-15; Maes Decl. ¶ 16, ECF No. 33-1 at 4.) At a second meeting, Maes again demanded $40,000 and the City lowered its offer to $7,000. (Maes Decl. ¶¶16-17, ECF No. 33-1 at 4.) On July 26, 2017, City Administrator Jacque Betz, informed Maes that the City considered the release he signed in October 2016 valid, that it would not engage in further negotiations, and considered the matter closed. (Piscadlo Decl. Ex. 26, ECF No. 24-1 at 126.)

Maes currently operates Cars-R-Us out of his home; he has not found another location for his business. (Maes Decl. ¶ 19, ECF No. 33-1 at 5.)

On December 7, 2017, Plaintiffs filed this lawsuit, asserting two § 1983 claims: (1) the City and all Defendants violated Plaintiffs' procedural due process rights guaranteed by the Fourteenth Amendment by denying him relocation benefits under O.R.S. § 35.510 and the URA; and (2) Defendants violated Maes's substantive due process rights by ignoring the processes for providing him relocation benefits.

*Legal Standard*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, unsupported conjecture, or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus

should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

To determine whether summary judgment is proper, the court must view the evidence in the light most favorable to the nonmoving party. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez*, 343 F.3d at 1112. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

### Preliminary Procedural Matters

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c). The court must determine what evidence is admissible, relevant, and substantive. FED. R. EVID. 104. A party filing a motion for summary judgment will generally support that motion with affidavits or declarations. Federal Rule of Civil Procedure 56 requires that the affidavits or declarations "be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). In ruling on a motion for summary judgment, the court will consider the admissibility of the proffered evidence's contents, not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its content."); *Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.)

Defendants object to two exhibits attached to Maes's Declaration in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment. Local Rule of Civil Procedure 56-1 provides:

> Rather than filing a motion to strike, a party must assert any evidentiary objections in its response or reply memorandum. Evidentiary objections in a response or reply memorandum are subject to the certification requirement of LR 7-1(a). . . . If an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum pursuant to this subparagraph within seven days addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection.

LR 56-1(b). Plaintiffs did not file a surreply responding to the evidentiary objections. The court discusses them below.

I.    Exhibit 1 – The September 20, 2016 Newspaper Article

Attached to Maes's Declaration in Support of their Response, Plaintiffs have attached a newspaper article appearing in the *Clackamas Review* entitled "Gladstone Set To Purchase Property on Portland Avenue," by Ellen Spitaleri, dated September 20, 2016. (Maes Decl. Ex. 1, ECF No. 33-1 at 7.) Defendants object to Exhibit 1, contending that it is inadmissible hearsay and that the quoted statements in the article are hearsay within hearsay. FED. R. EVID. 802; *Larez v.*

*City of Los Angeles*, 946 F.2d 630, 641 (9th Cir. 1991). Defendants argue that if the newspaper article is admitted and relied upon by the court, the court also should include in the record a correction offered in an email sent to the report on the day the article was published. According to Defendants, the newspaper did not publish the City's proposed correction. Plaintiffs did not respond to Defendants' evidentiary objections.

Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801. Hearsay is admissible only if it qualifies as an exception to the general hearsay rule. The Ninth Circuit has generally applied the limitations found in the hearsay rule, set forth in Rule 802 of the Federal Rules of Evidence, to evidence offered by parties at the summary judgment stage. *Orr v. Bank of America*, 285 F.3d 764, 778 (9th Cir. 2002); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule. FED. R. EVID. 805; *United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997).

In his Declaration, Maes states he believed the Kmetic family was willing to sell the Portland Avenue Property solely because the City threatened to acquire it through condemnation, based in part on the newspaper article. According to Maes, the September 2016 article suggests that the Kmetics had been forced to sell the property. (Maes Decl. ¶ 11, ECF 33-1 at 3.) The article indicates that the reporter spoke with Lynne Kmetic who indicated that the Kmetic family did not really want to sell, quoting her as stating "we didn't have a choice. [That is what happens] when you deal with government entities." (*Id.* at Ex. 1, ECF No. 33-1 at 7.)

Typically, newspaper articles are considered hearsay and are inadmissible when submitted for the truth of the matters asserted within the articles. *See Larez*, 946 F.2d at 642 ("newspaper articles have been held inadmissible hearsay as to their content"); *Hilsley v. Ocean Spray Cranberries, Inc.*, Case No. 17cv2335-GPC (MDD), 2018 WL 5617701, at *9 (S.D. Cal. Oct. 30, 2018) (noting that newspaper articles by their nature are hearsay evidence and are inadmissible if offered to prove the truth of the matter asserted). However, in this instance, the court finds that the newspaper article is being submitted to demonstrate, at least in part, the timing and source of the alleged "misinformation" about whether the Portland Avenue Property, in fact, was being condemned. Whether the property was purchased through an arm's length negotiation or through eminent domain is at the heart of this action, and therefore, the article is relevant to issues in this case. Accordingly, Defendants' objection to Exhibit 1 is OVERRULED. Additionally, the court will consider the Defendants' email to the reporter. The City's email response to the article likewise is relevant to the same issues. Notably, Plaintiff does not object to admission of the City's email response.

II.     Exhibit 9 – The Department of Justice Letter dated April 12, 1996

Defendants object to a Department of Justice ("DOJ") Letter dated April 12, 1996 attached as Exhibit 9 to the Declaration of Cameron Ramelli. (Ramelli Decl. ¶ 6 & Ex. 9, ECF No. 33-2 at 2, 14.) Defendants argue that the DOJ Letter is hearsay and irrelevant. FED. R. EVID. 402, 403, 802. Defendants argue the letter is not a formal DOJ opinion letter, was authored by an assistant attorney general, and thus has no precedential value. Defendants contend that the Letter fails to discuss any facts or legal issues relevant to the issues in this case, and therefore, the letter must be excluded from the court's consideration of these issues on summary judgment.

Exhibit 9 consists of a letter dated March 12, 1996, authored by Dale K. Hormann, Assistant Attorney General, addressed to Dennis Wiegal of the Oregon Department of Transportation ("ODOT"). (Ramelli Decl. Ex. 9.) In the letter, Hormann provides that a local government entity asked ODOT to enter into a right-of-way services agreement for a non-federally funded project, and whether relocation benefits must be paid pursuant to O.R.S. §§ 281.045 to 281.105, a predecessor statute to O.R.S. § 35.510. (*Id.*) Hormann opines that the statutory obligation to pay relocation benefits applies regardless of the source of funding. (*Id.*)

The court concludes that Exhibit 9 is not relevant to the issues in this case. Exhibit 9 does not involve either party to this action and pertains to ODOT entering into a right-of-way arrangement with a private party. Unlike this action, Exhibit 9 does not involve an arm's length negotiated purchase of real estate from a private party. Accordingly, Defendants' objection to Exhibit 9 is GRANTED.

*Discussion*

In their motion, Defendants argue that they are entitled to summary judgment because: (1) Maes has no protectable property interest in relocation benefits under the federal or state relocation assistance statutes; (2) Maes was not denied notice or an opportunity to be heard; (3) Maes was not subjected to arbitrary and capricious behavior; and (4) the individual Defendants are entitled to qualified immunity and there is no evidence that they acted outside of their official duties for the City.

Plaintiffs insist that they have a protected property right in relocation benefits under O.R.S. §§ 35.500 – 35.530, that his tenancy was terminated because of the City's acquisition of the Property, that the City fraudulently misrepresented the nature of their right to relocation benefits,

and their release is therefore invalid. Plaintiffs contend that the City refused to listen to Maes's concerns at the November 8, 2016 City Council Meeting, and that his later meetings with City officials did not provide meaningful review, thereby denying them procedural due process. And, Plaintiffs contend that by denying them relocation benefits, the City's actions were unlawful, arbitrary, and an abuse of power, violating substantive due process.

I.     Procedural Due Process

   *A.     Standards*

The Due Process Clause of the Fourteenth Amendment "forbids the State to deprive any person of life, liberty or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572 (1975). To establish a procedural due process violation, Plaintiffs must show: (1) a constitutionally protected liberty or property interest; (2) a deprivation of that interest by the government; and (3) the lack of adequate process. *Shanks v. Dressel*, 540 F.3d 1082, 1090-91 (9th Cir. 2008); *Icon Groupe, LLC v. Washington County*, 948 F. Supp. 2d 1202, 1209 (D. Or. 2013). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972); *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998). "Not every procedural requirement ordained by state law, however, creates a substantive property interest entitled to constitutional protection." *Shanks*, 540 F.3d at 1091.

A property interest sufficient to support procedural due process claim is defined by "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577; *Goss*, 419 U.S. at 572-73. The threshold inquiry is whether the

plaintiff has "'a legitimate claim of entitlement' as opposed to a 'unilateral expectation' or an 'abstract need or desire.'" *Foss*, 161 F.3d at 588 (quoting *Roth*, 408 U.S. at 577); *Icon Groupe*, 948 F. Supp. 2d at 1211. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to [such a benefit]." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Roth*, 408 U.S. at 577) (internal quotation marks omitted). If the plaintiff satisfies this threshold burden, the court then considers whether he or she received all the process that was due. *Foss*, 161 F.3d at 589.

B.    Analysis

Defendants argue that Plaintiffs cannot establish a protectable property interest in relocation benefits because neither the federal nor the Oregon statutes apply. Defendants contend that the federal statute does not apply because no federal funding was used and that the Oregon statute does not apply because the City and the Kmetic family engaged in an arm's length, negotiated purchase of the Property.

Plaintiffs respond that Oregon's statute applies regardless of federal funding, and that the City deprived Plaintiff of procedural due process by failing to provide him with adequate notice of his entitlement to relocation assistance benefits, or providing him with an opportunity for a hearing to challenge the amounts provided in the releases, as set forth in O.R.S. § 35.510. To survive summary judgment, Plaintiffs must establish that they have a protectable property interest in relocation assistance benefits under federal or state law. *Shanks*, 540 F.3d at 1091.

////

////

1.	The URA, 42 U.S.C. § 4601 of 1970

Under the URA, 42 U.S.C. §§ 4601 to 4655, when an agency undertakes a public project with federal financial assistance, the agency is required to provide relocation assistance benefits to displaced persons. *See Transwestern Pipeline Co., LLC v. 16.19 Acres of Property Located in Maricopa Cty.*, 627 F.3d 1268, 1269 (9th Cir. 2010) (stating that URA "sets forth procedures for land acquisitions by certain federal and federally assisted programs"). The URA was designed to establish a uniform, fair policy for agencies when negotiating with persons who are displaced when their property is taken for projects by the federal government or state government with federal assistance. *Regional Transp. Dist. v. Outdoor Sys., Inc.*, 34 P.3d 408, 415-16 (Colo. 2001) (discussing legislative history of URA).

Defendants argue that the City's project did not utilize any federal funding, and therefore, the URA simply does not apply. In their Response, Plaintiffs appear to concede that the federal relocation statute itself does not apply. Thus, to the extent that Plaintiffs' claims rest on the URA, Defendants are entitled to summary judgment.

2.	Oregon Relocation Assistance – O.R.S. § 35.510

The parties debate whether the City "acquired" the Portland Avenue Property and whether Maes is a "displaced person" under the relevant statutory provisions. Defendants argue that O.R.S. § 35.510 does not apply to voluntary sales of property, but rather applies only where property is acquired through condemnation or threats of condemnation. Plaintiffs respond that Oregon's statutory scheme applies whenever a public entity acquires property that results in displaced persons. Plaintiffs maintain that under a plain reading of O.R.S. § 35.510, they are entitled to relocation assistance benefits.

The Oregon statute requires public entities to provide relocation assistance whenever a public project will result in acquiring real property. OR. REV. STAT. § 35.510. The Oregon statute provides:

> Whenever any program or project is undertaken by a public entity which program or project will result in the acquisition of real property, notwithstanding any other statute, charter, ordinance, or rule or regulation, the public entity shall:
>
> > (1) Provide fair and reasonable relocation payments and assistance to or for displaced persons as provided under sections 202, 203, 204 and 206 of the Federal Act[1];
> >
> > (2) Provide relocation assistance programs offering to displaced persons and others occupying property immediately adjacent to the real property acquired the services described in section 205 of the Federal Act on the conditions prescribed therein;
> >
> > (3) In acquiring the real property, be guided by the land acquisition policies in sections 301 and 302 of the Federal Act;
> >
> > (4) Pay or reimburse property owners for necessary expenses as specified in sections 303 and 304 of the Federal Act;
> >
> > (5) Share costs of providing payments and assistance with the federal government in the manner and to the extent required by sections 211 (a) and (b) of the Federal Act; and
> >
> > (6) Appoint such officers, enter into such contracts, utilize federal funds for planning and providing comparable replacement housing and take such other actions as may be necessary to comply with the conditions and requirements of the Federal Act.

OR. REV. STAT. § 35.510. Additionally, the term "displaced person" is defined as:

> (1) "Displaced person" means any person who moves, or is required to move the person's residence and personal property incident thereto, or the person's business or farm operation as a result of:

---

[1] O.R.S. § 35.510 refers to the URA in effect on January 1, 2003. The URA was amended April 2, 1987. *See* Pub. L. No. 100-17, 101 Stat. 132 (Apr. 2, 1987).

> (a) Acquisition of the real property, in whole or in part, by a public entity; or
>
> (b) Receipt of a written order by such person from a public entity to vacate the property for public use.

OR. REV. STAT. § 35.500. The statute does not, however, define the term "acquisition."

### a.     *Plaintiffs are not displaced persons*

Defendants argue that Plaintiffs cannot establish a protectable property right in relocation assistance benefits because their lease expired before the City acquired the property. According to Defendants, tenants whose leases expire before the Property was acquired are not "displaced persons" under O.R.S. § 35.510. Thus, Defendants maintain that Plaintiffs are not entitled to relocation assistance, and their procedural due process claim fails as a matter of law, citing *Ackerley Commc'ns, Inc. v. Mt. Hood Cmty. Coll.*, 51 Or. App. 801, 805 (1981).

In *Ackerley*, an advertising company had a ten-year lease for placement of a sign on what became the college's property. 51 Or. App. at 803. Eight years into the lease, the college purchased the property for use as a parking lot and demanded the sign be removed. *Id.* The advertising company insisted that removal of the sign would give rise to relocation assistance benefits under federal and state law. The college allowed the sign to remain through the initial ten-year lease term. *Id.* When the ten-year term expired, the college demanded the sign be removed. *Id.* The Oregon Court of Appeals concluded that the advertising company was not a "displaced person" under either the federal or state act. *Id.* at 804. The *Ackerley* court found that the removal of the sign was not "required as a result of a written order to vacate the property" or as a result of the college's acquisition of the property because it was permitted to remain through expiration of the lease. *Id.* at 804-05. The *Ackerley* court concluded that "[w]e do not understand the federal or state

Acts to provide for relocation benefits where the legal right to maintain it at the location has terminated." *Id.* at 805. Defendants contend that as in *Ackerley*, Plaintiffs' month-to-month lease was terminated pursuant to the terms of the lease.

Plaintiffs respond that Defendants read the definition of displaced persons too narrowly and that *Ackerley* is distinguishable. According to Plaintiffs, they were long-term tenants on the Property and were required to vacate solely because the City was buying the Property. The court is not persuaded by Plaintiffs' arguments.

The facts reveal that the Kmetics informed all the tenants on the Property that their leases would be terminated as of December 15, 2016. The Notice from Kmetic RV Storage to the tenants provided the following:

> At this time, we would like to thank all of our customers, friends and tenants for all their support throughout the years. You have all been great to work with, helpful and supportive in our venture.
>
> We regret to inform you that The City of Gladstone and The Kmetic's have come to an agreement in regards to the property. As of November 15, 2016 all tenants rent will end and as of December 15, 2016 all tenants will have to be off the property. Anything left on the property after that date will be removed at the owners expense because the City of Gladstone wants everything removed before they take possession. We appreciate all your cooperation, please feel free to call with any questions you have.

(Piscadlo Decl. Ex. 27, ECF No. 24-1 at 127.) Plaintiffs do not dispute that they rented on a month-to-month basis. And, although the Notice provides that the Kmetics are selling to the City and that the City wants all of the tenants' property removed, the Notice terminating the leases was clearly provided by Kmetic RV Storage. Simply because Plaintiffs were long-term tenants does not provide them with enforceable, legal rights to remain on the property. As the *Ackerley* court determined, there is no right to relocation benefits for property "where the legal right to maintain

Page 19 – OPINION AND ORDER

it at the location has terminated." *Ackerley*, 51 Or. App. at 805. Plaintiffs have not established that after the Kmetics terminated the Cars-R-Us lease they had any legal, possessory right to maintain the business on the Property. Therefore, because Plaintiffs did not have any possessory rights extending beyond the City's acquisition of the Property, they have not established any right to relocation benefits as displaced persons.

*b.*      *the City did not "acquire" the Property*

Oregon courts have not interpreted the term "acquire" under the relocation assistance statute very frequently. When they have done so, the Oregon courts have interpreted "acquire" to exclude arm's length transactions. In *Shepard v. Dep't of Cmty. Corr.*, the Oregon Supreme Court examined whether a month-to-month residential tenant was entitled to relocation assistance under O.R.S. § 281.045, the statutory predecessor to O.R.S. § 35.510. *Shepard*, 293 Or. 191, 193 (1982). In *Shepard*, Washington County Board of Commissioners ("the Board") approached the owner/landlord of two houses near the Washington County Courthouse expressing interest in acquiring a leasehold interest to use the buildings as a restitution center for the Department of Corrections ("the Department"). *Id.* Existing long-term tenants in the two houses learned of the negotiations between the Board and the owner/landlord through newspaper articles. The tenants had month-to-month leases that could be terminated with thirty days' notice. *Id.* at 194-95. Eventually, the Board negotiated a five-year lease of the two houses and the owner/landlord notified the tenants their leases were terminated and provided a date certain to vacate the premises. *Id.* at 195. The tenants claimed they were entitled to relocation assistance pursuant to O.R.S. § 281.085. The Board denied the claim via letter, and again after a hearing finding that Washington

County did not acquire real property under the terms of the statute, and that the lease agreement did not result in tenants becoming displaced persons. *Id.* at 196.

On appeal, the *Shepard* court held that O.R.S. § 281.085 did not require the government entity to actually exercise its power of eminent domain in order to trigger the right to assistance. *Id.* at 203. However, examining the legislative history of the statute and its federal counterpart, 42 U.S.C. § 4651, the *Shepard* court recognized that relocation assistance statutes were intended to alleviate the financial burdens of those displaced "by the kind of governmental acquisitions of real property in which resort to condemnation proceeding would be at least a strong possibility if an arm's length purchase could not be accomplished." *Id.* at 203. Thus, the *Shepard* court concluded that relocation assistance was not contemplated by the legislation for all month-to-month tenants who might be displaced in every situation where a government agency acquires a leasehold interest in a modest amount of floor space[]" and would restrict a governmental agency to shopping on "the open market for rental space only in vacant properties unless the agency were willing an able to commit a disproportionate amount of public funds to the acquisition of a lessee's interest in realty." *Id.* at 204.

Plaintiffs attempt to distinguish *Shepard*, contending that it involved a lease of "a modest amount" of office space for only a period of five years. *Shepard*, 293 Or. at 203 (noting that the terms "programs or project" indicated that the legislation was concerned with the "displacement of persons on a relatively large scale"). According to Plaintiffs, because this case involves the purchase of a large amount of property for the construction of a new City Hall and/or Police Station, the rationale in *Shepard* does not apply. The court is not convinced.

As the *Shepard* court indicated, legislation providing for relocation assistance benefits was concerned with projects and programs for "redevelopment, open space preservation and construction of public facilities. Such projects are usually site specific; that is, the governmental agency sets out to acquire certain property for the program." *Shepard*, 203 Or. at 204. Continuing, the *Shepard* court explained that the record there failed to disclose that "the county was determined to obtain this specific rental space in this particular parcel of land" and that "there is nothing to indicate that the county would not have sought rental space in some other parcel." *Id.* at 205. And, the *Shepard* court reiterated that there was no "acquisition" as used in the statute because "[t]here is nothing to indicate that had negotiations failed the county would have resorted to condemnation proceedings to acquire the specific site to operate the center." *Id.*

The court agrees with Plaintiffs that the construction of a new Police Station or City Hall is precisely the type of public facilities contemplated by the relocation assistance benefit statute. However, as in *Shepard*, there is no indication in the record before the court that Kmetic property was "site specific." Indeed, the overwhelming evidence is to the contrary. Here, real estate agent Mr. Reser indicated that the City was interested in purchasing the Property if the Kmetic family was interested in selling; the City would not resort to condemnation and would walk away from the transaction if a mutually agreeable purchase and sale could not be negotiated. (Reser Decl. ¶¶ 2-4, ECF No. 24-2.) One of the conditions the City required was that the seller (the Kmetics) deliver the Property free and clear of all tenants at closing. (Piscadlo Decl. Ex. 9 at 4, ECF No. 24-1 at 78.) Doughman, the City's attorney, also provided that the City did not authorize condemnation of the Property and that the City would find a different parcel of property if the negotiations failed. (Doughman Decl. ¶¶ 4-6, ECF No. 24-3.) And, Doughman confirmed in an

October 7, 2016 email that the City would not close with the tenants on the Property. (Piscadlo Decl. Ex. 13, ECF No. 24-1 at 105.) Doughman clarified to Steven Kmetic that the sale was not "forced" and that unless it was clear that the City would not face legal action from the tenants, it would not close on the Property. (*Id.*) At a November 9, 2016 City Council meeting, the City confirmed that it was not condemning or using eminent domain to force a sale of the Property. (Doughman Decl. Ex. 16, ECF No. 24-1 at 111.)

Recognizing that the City's evidence shows that it would not resort to condemnation if a sale could not be negotiated, Plaintiffs suggest that the City implied that it would do so during private negotiations with the Kmetics. Plaintiffs highlight a draft letter from Mr. Reser to Kenneth Kmetic describing that the City wanted to acquire the Portland Avenue Property through a "friendly condemnation" which would allow him to "defer taxes on the proceeds under Section 1033 of the Internal Revenue Code (Condemnation and Involuntary Conversion.) (Ramelli Decl. Ex. 5, ECF No. 33-2 at 3.) Plaintiffs contend that the Kmetics did not fully understand the concept of a "sale in lieu of condemnation" or "friendly condemnation," but understood what condemnation meant. Plaintiffs argue that the threat of condemnation was "very real" to the Kmetics, and that therefore, the relocation statute applies. Plaintiffs' argument would be more convincing if made by the Kmetics; here, that is not the case.

The evidence from the sellers consistently provides that the City did not threaten condemnation if the sale did not go through. In his deposition, Kenneth Kmetic testified that he received the draft letter, and that Mr. Reser met with him, his wife Lynne, and Steven Kmetic to discuss the City's offer. (Kenneth Kemetic Dep. 8:7-16, ECF No. 33-2 at 5.) Kenneth Kmetic indicated that Mr. Reser was specific, and informed him that "it was not gonna go that far" and

that it "was highly unlikely" that the City would condemn the property. (Kenneth Kemetic Dep. 9:1-12, ECF No. 33-2 at 6.) Later in his deposition, Kenneth Kmetic indicated that during their conversation, Mr. Reser informed him that if he felt the City's offer was not enough, he should not accept it. (Kenneth Kemetic Dep. 15:6-16, ECF No. 24-1 at 71; Kenneth Kmetic Dep. 34:2-18, ECF No. 33-2 at 9.) And, Kenneth Kmetic specifically denied that the City was threatening condemnation, stating that he felt he could have just told the City he was not interested, and:

> Q: . . . I think – think we went through this, but maybe just to make sure: The City wasn't threatening you that, "Hey, if you don't sell us this, we're gonna condemn it"?
>
> A.    No.

(Kenneth Kemetic Dep. 15:12-16, ECF No. 24-1 at 71.)

Lynne Kmetic admitted in her deposition that Mr. Reser never mentioned the term condemnation in their March 2016 meeting when discussing sale of the property. (Lynne Kmetic Dep. 17:5-11, ECF No. 33-2 at 17.) And, Steven Kmetic testified that the sale of the Property was a voluntary transaction and that the City was not threatening condemnation. (Steven Kmetic Dep. 14:18-23, 15:18-16:1, ECF No. 24-1 at 61-63.) Contrary to Plaintiffs' perception of the transaction, the evidence clearly shows that the Kmetics were not selling the Portland Avenue Property because the City was threatening condemnation.

The court is not convinced that simply because the City offered to structure the sale through a tax-advantageous 1033 exchange, that offer equates to the City threatening to condemn the Property. A 1033 exchange would provide tax benefits to the sellers should they choose to purchase other property within a specified time frame. Aside from suggesting that the Kmetics did not fully understand the concept of a "sale in lieu of condemnation" Plaintiffs have not demonstrated that

the City either implicitly or explicitly intended to pursue condemnation if the sale could not be negotiated.[2] As discussed above, the evidence is clear that the sellers understood that the City was not threatening condemnation, and that the City on numerous occasions made it clear in the public record and its correspondence with the Kmetics that it would not close on the sale if the agreed upon terms could not be satisfied. Thus, it is undisputed that the City purchased the Property through a voluntary, arm's length negotiated sale.

Plaintiffs have failed to establish a genuine issue of fact that the City would have resorted to condemnation proceedings to acquire the Portland Avenue Property in the event negotiations failed. Accordingly, there was no "acquisition" within the meaning of O.R.S. § 35.510. Moreover, because there was no acquisition, O.R.S. § 35.510 does not apply, and thus, Plaintiffs have failed to establish that they were entitled to relocation assistance benefits under the statute. Without a right to the relocation assistance benefits, Plaintiffs have no protectable property interest, and their procedural due process claim fails as a matter of law. *Shanks*, 540 F.3d at 1091-92 (holding that where there is no "constitutionally cognizable property interest," the plaintiff's procedural due process claim fails as a matter of law); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994) (holding that "[s]ince the Gagliardis lack a property interest in the enforcement of the Pawling zoning laws, they are unable to state an actionable claim for deprivation of procedural due process.").

////

////

---

[2] Additionally, there is no evidence in the record indicating whether the Kmetic family structured the sale as a 1033 exchange at closing. (Piscadlo Decl. Ex. 9 at 24, ECF No. 24-1 at 98.)

### c. Plaintiffs released the City

The City also argues that Plaintiffs do not have a protectable property interest because they signed a release waiving any potential relocation assistance benefits under O.R.S. § 35.510. As described above, in light of the newspaper article and the statements from Lynne Kmetic, there was confusion among the long-term tenants on the Property, including Plaintiffs. The City amended original purchase and sale agreement and asked each tenant to sign a release that offered two months' rent in exchange for releasing the City from any potential obligations under O.R.S. §§ 35.500 – 35.530. (Piscadlo Decl. Ex. 10 at 2, ECF No. 24-1 at 102.) Some of the tenants did not want to sign the releases, asserted they were not legal, and demanded additional time to vacate the property. (Piscadlo Decl. Ex. 12, ECF No. 24-1 at 104.) Doughman reiterated to the sellers that the City was not "forcing the sale" of the Property, and that he could not recommend closing on the Property if the City would face legal action from the tenants, and he threatened to back out of the sale if the issues with the tenants could not be resolved. (Piscadlo Decl. Ex. 13, ECF No. 105.) In response, Steven Kmetic relayed that he had spoken with two of the tenants who now understood the City's purchase was not a condemnation, and that they would agree to sign the releases if they were provided additional time to vacate. (Piscadlo Decl. Ex. 14, ECF No. 24-1 at 107.)

On October 18, 2016, Plaintiffs signed a release that provided the following, in relevant part:

> The Trust is seeking to sell the Property and will terminate Cars' tenancy prior to closing a sale of the Property. The City of Gladstone ("City") is seeking to purchase the Property. The City is not using its eminent domain authority to acquire the Property or otherwise forcing a sale of the [P]roperty. As the City and Trust have explained to Cars, the City and the Trust are engaged in an arms-length, negotiated purchase and sale of the Property.

> In exchange for Nine Hundred Twenty Six Dollars and No Cents ($926.00), and the right to stay on the Property through January 1, 2017, Cars releases the City from any obligation it may have under state or federal law, including ORS 35.500-35.530, to provide relocation assistance to Cars if it purchases the Property.

(Piscadlo Decl. Ex. 15, ECF No. 24-1 at 108.) Maes appeared at a November 9, 2016 City of Gladstone Council Meeting and complained that the releases were not equitable, and attempted to rescind his release.

Defendants argue that Plaintiffs are bound by their release and that there is no evidence in the record that Plaintiffs were coerced into signing it. According to Defendants, Plaintiffs have not proffered any viable reason for revoking the release; therefore, Plaintiffs have waived any potential property interest in relocation assistance benefits and they are entitled to summary judgment as a matter of law.

Plaintiffs argue that the release is not valid for two primary reasons. First, Plaintiffs contend that O.R.S. § 35.510 is for the public benefit and that the City could not ask Plaintiffs to contract away those benefits. Second, Plaintiffs argue that Defendants misrepresented that they were not entitled to any relocation benefits and that they were fraudulently induced to enter the contract. According to Plaintiffs, because of the City's fraudulent inducement, they may freely void the release. *See Bodenhamer v. Patterson*, 278 Or. 367, 374 (1977) ("[A] purchaser who has, in fact, been induced to enter a contract by an intentional misrepresentation may rescind the contract even though his reliance may have been negligent.").

As discussed above, the court has determined that the O.R.S. §§ 35.500-35.530 does not apply. Therefore, the Defendants did not misrepresent that fact to Plaintiffs when asking them to waive any potential benefits under the statute. Additionally, the release provides that the Kmetic Trust is seeking to sell the Property and that the City is seeking to purchase the Property in an

Page 27 – OPINION AND ORDER

arm's length negotiation. Further, the release clearly provides that the Trust is terminating Cars' lease prior to the close of the sale. Aside from the Oregon statute, Plaintiffs assert no other basis for rescinding the release in this action. Because Plaintiffs have not established that they have a protected property right in relocation benefits under Oregon's statute, their procedural due process claim fails as a matter of law.

In short, viewing all the evidence in the light most favorable to Plaintiffs, they have not established they have a protectable property interest in relocation benefits under federal or state law. Accordingly, Defendants are entitled summary motion judgment on Plaintiffs' procedural due process claim. *Shanks*, 540 F.3d at 1092 (holding that absent a protectable property interest in enforcement of historic preservation ordinance, procedural due process claim fails).

C.  *Plaintiffs Received Adequate Notice and Opportunity To Be Heard*

Defendants argue that even if Plaintiffs could establish that they have a protectable property interest in relocation benefits, their procedural due process claim under the Fourteenth Amendment would fail as a matter of law because they were afforded adequate procedural protections. Plaintiffs respond that City officials did not listen to his concerns in a meaningful way and that the writ of review process was not available to appeal the City's denial of relocation benefits.

1.  standards

Procedural due process provides that person may not be deprived of a life, liberty or property without an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations and citations omitted); *see* U.S. Const., amend. XIV § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law.") Procedural due process does not require that the notice and

opportunity to be heard occur before the deprivation, or that a hearing be conducted, so long as pre- or post-deprivation procedures are adequate. *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1082 (9th Cir. 2010). The factors to be weighed are: (1) the importance of the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of a property interest through the procedures used and the probable value of additional safeguards; and (3) the government's interest, including any monetary or efficiency costs associated with increased procedural safeguards. *Mathews*, 424 U.S. at 335. At bottom, the due process evaluation "'is flexible and calls for such procedural protections as the particular situation demands.'" *Mathews*, 424 U.S. at 334; *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

2.     process was adequate

Presuming arguendo that Plaintiffs have established a property right, there can be no question that Plaintiffs received actual notice that the City denied his entitlement to such benefits. *See Espinosa v. U.S. Aid Funds, Inc.*, 553 F.3d 1193, 1203 (9th Cir. 2008) (holding actual notice satisfies notice component of procedural due process). Thus, the question is whether Plaintiffs were afforded an opportunity to be heard.

Due process does not always require an adversarial or evidentiary hearing. *Buckingham*, 603 F.3d at 1082-83; *see also Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 16 n.17 (1978) ("The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a due process hearing in appropriate circumstances.") "The core requirement is to give the individual the 'opportunity to speak up in his own defense' while the government 'listen[s] to what he has to say,' because 'fairness rarely can be obtained by secret, one-sided determination of facts decisive of rights.'" *Elizondo v. City of Junction City*, 6:15-

cv-01853-AA, 2016 WL 659082, *4 (D. Or. Feb. 16, 2016) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972)), *aff'd* 669 F. App'x 855, 856 (9th Cir. 2016). Under some circumstances, notice and an opportunity to be heard at a public meeting may satisfy the requirements of procedural due process. *Littlefield v. City of Afton*, 785 F.2d 596, 603 (8th Cir. 1986), *overruled on other grounds as recognized by Bituminous Materials, Inc. v. Rice Cty., Minn.*, 126 F.3d 1068, 1070 (8th Cir. 1997) (holding that city council meetings satisfied procedural due process protections where appellants given notice of meetings and opportunity to be heard at meetings).

Plaintiffs complain that the City did not listen to Maes's concerns at the November 9, 2016 City Council hearing, and that they were deprived of a meaningful opportunity to have their concerns heard. As discussed above, Plaintiffs had multiple opportunities to be heard on their contention that they were entitled to relocation benefits. Contrary to Plaintiffs' assertion, Maes was provided with an opportunity to speak at the November 9, 2016 City Council hearing, at which he challenged the City's position that he and the other tenants were not entitled to relocation benefits. Additionally, on December 28, 2016, Maes sent a letter to the mayor and City Councilors requesting relocation benefits and reiterating his position that the City failed to provide adequate notice of eligibility for benefits, assistance, and moving expenses, and requested an appeal. The City responded to Maes's letter on January 12, 2017, denying his request for benefits and that it would not conduct an appeal because the relocation benefits statute did not apply. In February 2017, Doughman set up a meeting with Maes's attorney to explore resolution. In March 2017, Maes and his attorney met with Doughman and numerous City officials engaged in negotiations at which Plaintiffs rejected the City's offer of $13,500, instead demanding $40,000.

Although Plaintiffs did not reach an agreement with the City for relocation benefits, there can be no question that Plaintiffs and their attorneys had ample opportunity over several months to make their position known through meetings and correspondence with City officials. Plaintiffs clearly communicated their position to the City and voiced their disagreement about the City's interpretation of relocation benefits. While Plaintiffs' efforts were unsuccessful, the court cannot conclude that he was denied an opportunity to be heard.

The court concludes that Plaintiffs' opportunities to challenge the City's decision to deny relocation benefits at the City Council hearing and through multiple later meetings satisfies due process under these circumstances. Therefore, the court concludes that the process was constitutionally adequate under the circumstances. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (holding that procedural due process simply requires notice of the proposed decision, an explanation of the evidence supporting the decision, and a meaningful opportunity for the affected party to tell his side of the story).

The parties appear to dispute whether Plaintiffs could have pursued an appeal from the City's denial by pursuing a writ of review, a writ of mandamus, or a declaratory judgment action. *See* OR. REV. STAT. §§ 34.020 (writ of review), 34.110 (writ of mandamus), 28.020 (declaratory judgment action). This court need not determine which route is the correct procedure to follow here because the court has determined that the City provided the constitutionally adequate due process protections in this instance. Moreover, Plaintiffs do not articulate what additional procedural safeguards are necessary to comport with Fourteenth Amendment procedural due process requirements under these circumstances, or cite to case law requiring more process than that accorded by the City in this instance. Accordingly, because the court finds that Plaintiffs were

provided notice and an opportunity to be heard, the court concludes that Plaintiffs' procedural due process claim fails as a matter of law. *Elizondo*, 2016 WL 659082, at *4 (holding that home-owners were afforded adequate procedural protections where they presented concerns about tree removal to city committee members and city council).

II.     Substantive Due Process

    *A.     Standards*

Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (internal quotations and citations omitted). "To state a substantive due process claim," a plaintiff must typically "show as a threshold matter that a state actor deprived it of a constitutionally protected life, liberty or property interest." *Shanks*, 540 F.3d at 1087. "Substantive due process protection is usually reserved for the vindication of fundamental rights, such as matters relating to marriage, family, procreation, and bodily integrity." *Merrill v. Cty. of Madera*, No. 1:05-cv-0195 AWI SMS, 2013 WL 1326542, at *4 (E.D. Cal. Mar. 29, 2013) (citing *Albright v. Oliver*, 510 U.S. 266, 272 (1994)). Typically, where a plaintiff relies on substantive due process to challenge governmental actions that do not impinge on fundamental rights, the court is not required to find that the defendant's actions actually advanced their stated purposes; instead, the court must "merely look to see whether the government could have had a legitimate reason for acting as it did." *Halverson v. Skagit County*, 42 F.3d 1257, 1262 (9th Cir. 1994). Decisions based on erroneous legal interpretations or decisions made without due care are not constitutionally arbitrary. *Shanks*, 540

F.3d at 1088; *Merrill*, 2013 WL 1326542, at *6 (holding that county's delay in issuing permits and citation for ordinance violations was not constitutionally arbitrary).

Thus, to survive Defendants' summary judgment motion on their substantive due process claim, Plaintiffs must show that the City's actions were arbitrary and capricious and denied them a legally cognizable property interest. Because Plaintiffs' claim does not involve a fundamental right, Plaintiffs must demonstrate the City's actions "'*could* have had no legitimate reasons for its decision.'" *Halverson*, 42 F.3d at 1262 (quoting *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1238 (9th Cir. 1994)). If it is "at least fairly debatable" that the City's decision to deny relocation benefits is rationally related to a legitimate government interest, there is no substantive due process violation. *Id.* (holding that a plaintiff alleging a violation of substantive due process bears a "heavy burden").

### B.    Analysis

As discussed above, the court has determined that Plaintiffs have failed to establish that they have a protected property right in relocation benefits. Therefore, Plaintiffs' substantive due process claim fails as a matter of law. *Shanks*, 540 F.3d at 1091-92 (holding that where there is no substantive property interest at stake, the plaintiff may not insist on compliance with a particular procedure; rejecting substantive due process claim); *see Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (9th Cir. 2003) (holding that where there is no protected property interest, the court need not address whether the defendant's procedures may have violated that interest).

Even assuming arguendo that Plaintiffs could establish a protectable property interest in relocation benefits, Plaintiffs have not demonstrated that the City's determination that they were

not entitled to relocation benefits is constitutionally arbitrary. *See Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1058 (9th Cir. 2012) (holding that even if plaintiffs could establish property right in development of shoreline, they could not establish that the city's building moratorium violated substantive due process). It is clearly established that even if the City has erroneously interpreted state law, "not every violation of state law amounts to an infringement of constitutional rights." *Samson*, 683 F.3d at 1060 (citing *Paul v. Davis*, 424 U.S. 693, 700 (1976)); *Shanks*, 540 F.3d at 1088.

Furthermore, Plaintiffs have not presented any evidence that City abused its power or was engaged in deception in negotiating the purchase of the Property. While it is unfortunate that misinformation about the nature of the purchase may have engendered confusion, resentment, or hostility with the tenants, Plaintiffs have not offered any evidence to refute that the Property was purchased through an arm's length negotiation. Plaintiffs have not demonstrated that the City's offer of two months' rent in exchange for releases was an abuse of power or otherwise egregious behavior. Here, the City could rationally decide that providing compensation to tenants in exchange for releases would save taxpayer resources and was preferable to costly litigation. And, Plaintiffs have failed to show that the City's unsuccessful attempts to resolve their claims by offering up to $13,500 was arbitrary and capricious. Likewise, the City could rationally attempt to resolve Plaintiffs' claims in a cost-effective manner and could rationally reject Plaintiffs' $40,000 offer as too expensive in light of nature of the claims.

Therefore, the court concludes that no rational trier of fact could conclude that the City's denial of Plaintiffs' request for relocation benefits was arbitrary or capricious. *Shanks*, 540 F.3d at 1088 (holding building permit was not egregious or arbitrary government conduct and rejecting

substantive due process claim); *Hoeck v. City of Portland*, 57 F.3d 781, 786 (9th Cir. 1995) (granting summary judgment on substantive due process claim where city's demolition of plaintiff's vacant building had a rational basis); *Halverson*, 42 F.3d at 1263 (granting summary judgment on substantive due process claim where plaintiffs failed to show county's decision to build and maintain dike to prevent flooding was arbitrary or capricious).

III.   Qualified Immunity

    *A.    Standards*

    "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Sjurset v. Button*, 810 F.3d 609, 614 (9th Cir. 2015). Qualified immunity balances the "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "In determining whether qualified immunity applies, courts 'must determine whether: (1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation.'" *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 617 (9th Cir. 2018) (quoting *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016)). The court may examine these two

requirements in either order; failure of either precludes Plaintiffs' claim against the Individual Defendants.

To determine if a constitutional right was clearly established at the time, the key question is whether the officials "'should have known their specific actions were unconstitutional given the specific facts under review.'" *Daniels Sharpsmart*, 889 F.3d at 617 (quoting *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016)). To be considered "clearly understood," the right must be sufficiently clear that "every reasonable official would have understood that what he is doing violates that right" and that existing legal precedent put the constitutional question "beyond debate." *Hamby*, 821 F.3d at 1090-91 (internal quotations and citations omitted). Thus, state and local officials are entitled to qualified immunity so long as no precedent squarely governs the officials' conduct at issue, and the court must conclude that only someone "plainly incompetent" or who knowingly violated the law would have acted as the officials did. *Id.* at 1091.

B.  *Analysis*

Plaintiffs attempt to hold the Individual Defendants, who are various Gladstone City officials, personally liable in damages for their participation in the decisions to deny them relocation benefits. To survive summary judgment, Plaintiffs must defeat the Individual Defendants' defense of qualified immunity. To defeat the qualified immunity defense, Plaintiffs must show that they suffered a deprivation of a constitutional right and that the right was clearly established at the time of the alleged misconduct. Plaintiffs are unable to do so.

As discussed above, viewing the evidence in the light most favorable to Plaintiffs, they have not placed "beyond debate" the unconstitutionality of the Individual Defendants' actions. Here, Plaintiffs have not pointed to any precedential authority in existence at the time the

Individual Defendants approved the City's purchase of the Property or were engaging in negotiations with Plaintiffs' counsel that Plaintiffs were entitled to relocation benefits. To be sure, there was no "precedent on the books" from April 2016 through December 2017 that would have made clear to the various Individual Defendants that their actions clearly were violating the Constitution. *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (holding prison officials entitled to qualified immunity where no "precedent on the books" would have made it clear that lack of adequate suicide prevention protocols violated the Constitution); *see Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967 (9th Cir. 2010) ("To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act."). Therefore, because the Individual Defendants were not contravening clearly established law, they are entitled to qualified immunity. *Hamby*, 821 F.3d at 1092 (granting qualified immunity to prison officials where inmate could not establish that prison officials knew their actions violated clearly established legal precedent at the time of their actions).

Additionally, as Defendants correctly contend, each Individual Defendant's understanding of the law was reasonable at the time. Here, the facts show that the Individual Defendants relied on the advice of Mr. Doughman who advised them that Plaintiffs were not entitled to relocation benefits under state or federal law. As noted, Plaintiffs have not identified any legal authority clearly establishing that they had a protectable property interest in relocation benefits. Thus, based on Mr. Doughman's advice and the facts of this case, the Individual Defendants had sufficient reason to believe that their actions were justified. *Hamby*, 821 F.3d at 1095 (holding prison officials entitled to qualified immunity where they acted on bona fide medical advice that surgical intervention was unnecessary); *Los Angeles Police Protective League v. Gates*, 907 F.2d

879, 888 (9th Cir. 1990) (holding that police officers could not hide behind advice of attorney, but where officers faced complex legal issue, sought legal advice and followed it, applying qualified immunity to situation reasonable). Plaintiffs have failed to establish that each Individual Defendant's actions were unreasonable under the circumstances. *Anoushiravani v. Fishel*, Case No. CV 04-212-MO, 2004 WL 1630240, at *14 (D. Or. July 19, 2004) (noting that reasonable reliance on advice of counsel factors in favor of finding qualified immunity).

In short, even when viewing the evidence in the light most favorable to Plaintiffs, they have not demonstrated that the Individual Defendants' actions clearly violated Plaintiffs' Constitutional rights. Consequently, each of the Individual Defendants is entitled to qualified immunity, and summary judgment must be entered in their favor.

*Conclusion*

Based on the foregoing, Defendants' Motion for Summary Judgment (ECF No. 24) is GRANTED. This action is DISMISSED.

IT IS SO ORDERED.

DATED this 23rd day of January, 2020.

JOHN V. ACOSTA
United States Magistrate Judge